740 So.2d 963 (1999)
Christopher D. COOK, Appellant,
v.
The PRESIDENT CASINO and Insurance Company of the State of Pennsylvania, Appellees.
No. 98-CC-00294-COA.
Court of Appeals of Mississippi.
June 8, 1999.
Brent M. Bickham, Pascagoula, Attorney for Appellant.
William D. Blakeslee, Gulfport, Attorney for Appellees.
EN BANC.
PAYNE, J., for the Court:

PROCEDURAL HISTORY
¶ 1. Christopher Cook filed his petition to controvert on July 15, 1994, against President Casino. Prior to the hearing before the administrative law judge, the parties stipulated Cook's average weekly wage with President Casino to be $240 per week.
¶ 2. By order of March 22, 1996, the administrative law judge concluded that *964 Cook had sustained a work-related accident on June 11, 1993, and that Cook was entitled to temporary total disability benefits for a period between June 12, 1993 and November 7, 1994the date the administrative law judge found Cook reached maximum medical improvement. The employer and carrier provided medical services and supplies. Furthermore, the administrative law judge concluded that Cook made no effort to secure employment once he had been released by his treating physicians. The administrative law judge also concluded that Cook sustained no permanent disability or permanent industrial disability from this accident. Thereafter, Cook filed a petition for review before the Commission on March 28, 1996, challenging the rulings of the administrative law judge.
¶ 3. On July 17, 1996, the Commission affirmed the ruling of the administrative law judge. On July 24, 1996, Cook filed a notice of appeal to the circuit court. On January 27, 1998, the circuit court entered an order affirming the ruling of the Commission. Feeling further aggrieved, Cook filed his notice of appeal on February 13, 1997.
¶ 4. Having read the arguments presented and the law as it applies, we find that the administrative law judge, the Commission, and the circuit judge were in error in relying on evidence which was corrupted by viewing a videotape of the claimant's brother and in employing the wrong legal standard in determining whether the claimant received a permanent partial injury to a scheduled member. We reverse and remand this case to the Commission for proper determination of the claimant's permanent injury, if any, by his treating physician.

FACTS
¶ 5. Christopher Cook was employed as a security guard at the President Casino and was injured while attending to cars at the casino's parking lot. At the time of the accident, Cook was twenty-four years old and a resident of Biloxi, Mississippi. The extent of his education is graduation from high school. At the casino, Cook's duties entailed walking around the casino intercepting would be disturbances, at times checking employees' badges at the front door, and checking delivery trucks bringing supplies to the casino.
¶ 6. Cook was injured when a car forced him to jump out of the way. He fell and injured his left foot. Thereafter, Cook was taken to the Biloxi Regional Hospital where his foot was wrapped in a cast. Subsequently to these events, Cook visited several physicians who treated his condition.
¶ 7. Testifying for the casino, William Price stated that he and Field Investigator Gary Herstes videotaped on three separate occasions a person whom they believed to be Christopher Cook. William Price stated on direct examination:
Q. All right. When the video was taken in this case, what factual information if any was used to determine if the person shown in the videotape is the claimant or if the claimant was working at the place where the videotape was taken?
A. We had a physical description showing height, weight, age, race. We had a picture, and after taking the video, we then showed it to the claimant's place of employment [President Casino] and the person who supervised him told us that we had the proper person.
Though not questioned extensively, Price was asked about the camera he used in filming, and the distance he stood from those he helped film:
Q. And what was the distance of the subject to the vidoecamera when you took the videotapes?
A. Approximately 50 feet or something like that.
Q. Did you use a telephoto lens?
A. No, it was on a standard VHS video format. I believe it was probably 30 millimeter or something like that.
*965 ¶ 8. Several Cook family members testified about this videotape. Craig Cook, Christopher Cook's brother, stated:
A. It was a video of me, my Dad and my oldest brother [Alvin]. We was working on a Mazda truck.
Q. Did Chris ever work on the Mazda truck?
A. No, sir.
Q. And did any of the video show Chris at all?
A. No, sir.
BY ADMINISTRATIVE JUDGE THOMPSON: The man in the film looks more like Mr. Craig Cook to me because of the short clipped hair and the height.
Chris Cook was questioned and testified about the videotape.
Q. So when was the last time you worked at your father's body shop?
A. June the 11th, the day of the accident.
Q. You're contending that's the last time you worked at your father's body shop?
A. Yes, sir.
Willie Mae Cook, Christopher's mother, was also questioned and testified about the videotape.
Q. Can you tell me who was in the videotape?
A. It was Craig, my husbandCraig and my husband that I can remember.
Q. Did you ever see Chris in the videotape?
A. Oh, no, he wasn't in it.
After this testimony, Administrative Law Judge Thompson stated:
After watching the tape and seeing the folks and listening to the testimony, I think it'sI can't be certain because these two men look a lot alike and I can't quite imagine what Mr. Chris Cook would look like without the distinctive hairdo that he has now. If his hair were short I'd think he'd look a whole lot like his brother Craig. I think, however, just with the height and weight it looks more like Craig Cook on that videotape to me than Chris Cook. So at least I couldn't say for certain who that videotape depicts.
¶ 9. Several physicians and one physical therapist testified in this matter by deposition. Dr. James Butler, an orthopedic surgeon, testified that he examined Cook on six occasions between November 17, 1993 and June 15, 1994.[1] He observed that Cook exhibited no objective criteria to establish any impairment rating. In fact, Dr. Butler noted that he did not give Cook any type of disability from an orthopaedic standpoint. In his own words, Dr. Butler stated that "[b]ased on objective criteria he does not have an impairment rating." Dr. Butler further testified that he could see no problem in Cook's returning to his regular activities of assisting with the parking lot security. Furthermore, Dr. Butler stated that he found that Cook had reached maximum medical improvement on March 2, 1994.
¶ 10. Dr. Richard Gorman testified that he is a neurologist and that he first saw Cook on July 18, 1994. Dr. Gorman prescribed medication and a pair of Birkenstock sandals. He noted that based upon a reasonable medical probability, Cook was suffering from reflex sympathetic dystrophy. Dr. Gorman believed that the patient was disabled for his occupation; however, he deferred the percentage of disability to Dr. Butler.[2] He also stated that Cook reached maximum medical improvement on November 7, 1994.
¶ 11. Dr. Sidney Smith testified that he *966 saw Cook on August 28.[3] Dr. Smith added that he could find nothing to indicate any organic basis for disability to Cook's foot.[4]
¶ 12. Physical therapist Douglas Roll testified that he performed a functional capacity evaluation of Cook on October 19 and October 20, 1995. Mr. Roll noted that Cook gave poor effort in his strength test thus, Mr. Roll testified, he was unable to accurately assess muscle strength. Concerning Cook's injured foot, Cook noted that if he put weight on his left foot, he would pass out, yet while being evaluated by Roll, Cook would lead with his left foot and "put total and complete weight bearing on that left foot occasionally."
¶ 13. Furthermore, Roll noted:
Q. In your opinion, did the claimant give maximum and consistent effort in performing the functional capacity evaluation?
A. No, he did not.
Q. In your opinion, did the claimant exhibit findings indicating symptom magnification?
A. Yes, he did.
It was also Mr. Roll's testimony that Cook exhibited inconsistent and non-organic findings on sensation testing. In a similar vein, Mr. Roll noted that Cook gave submaximal and inconsistent effort and as indicated above exhibited findings of symptom magnification on his functional capacity evaluation. Mr. Roll did note that Cook's performance on the functional capacity evaluation coupled with the videotape of someone represented as Cook created doubts as to the claimant's veracity. As stated by Mr. Roll, "After viewing the videotape and comparing what I saw in the videotape to what I saw during the functional capacities evaluation, I would have to say there is a credibility problem."
¶ 14. Dr. Richard Smoot, a clinical psychologist, testified that his evaluation indicated that Cook was an individual who would likely have a great deal of somatic complaints and histrionic personality traits. The record is void as to the date Dr. Smoot evaluated Cook. However, the record indicates that Dr. Smoot wrote Mr. Blakeslee (attorney for employer/carrier) a letter dated October 24, 1994. Thus, we assume this letter was in relation to Dr. Smoot's clinical evaluation of Cook. Concerning the letter of October 24, 1994, Dr. Smoot noted that "Mr. Cook does not appear to be malingering." Furthermore, Dr. Smoot noted in his letter of October 24, 1994 that "[i]f such a video exists, it would not be inconsistent with the current findings suggestive of Mr. Cook's possible exaggeration of his physical problem."
¶ 15. Cook testified that he has not worked anywhere since the date of the June 11, 1993 accident and admitted that he had not sought or been denied employment with any employer since June 11, 1993. Concerning his physical activities, Cook stated that he is no longer able to play basketball and softball, bowl, or fish. Cook also noted that he lives with constant throbbing pain which hinders his sleep.

LAW AND DISCUSSION OF ISSUES

STANDARD OF REVIEW
¶ 16. The standard of review utilized by this Court when considering an appeal of a decision of the Workers' Compensation Commission is well settled. "This Court will overturn a[C]ommission decision only for an error of law or an unsupportable finding of fact." Georgia Pacific Corp. v. Taplin, 586 So.2d 823, 826 (Miss.1991) (citations omitted).

I. WHETHER THE ADMINISTRATIVE LAW JUDGE SHOULD HAVE STRICKEN THE DEPOSITION TESTIMONY OF DR. JAMES C. BUTLER, M.D., DR. SIDNEY SMITH, *967 M.D., DR. RICHARD L. SMOOT, PHD, AND DOUGLAS ROLL, P.T.
¶ 17. The focus of Cook's first citation of error centers on a videotape that was taken on July 13, 1994 and July 22, 1994, of someone purported to be Cook when there is no evidence that the person pictured was the appellant. Cook insists that the videotape corrupted the view of the various medical personnel who clinically evaluated him, thus he believes that their testimony should be nullified. Cook emphasizes the fact that this video taken was one of his brother. Thus, he argues that the attorney for the employer was unjustified in representing the figure in the videotape as being him (Chris Cook) to the individuals who medically treated him for his condition. Indeed, the administrative law judge noted that she was unable to discern whether the videotape was Cook or his brother. She stated:
As far as the doctor's depositions or the Physical Therapist's deposition, I would think I would have to disregard that testimony directly involving opinions made or comments made after viewing the videotape, but I can't imagine that would negate all of the rest of the findings that these professional people have offered, experts have offered.
The administrative law judge further reflected in her order of March 22, 1996:
The administrative judge has not, however, stricken the entire depositions as requested by the claimant because the physicians and physical therapist have testified about their own findings made upon examination or evaluation before shown the videotape.
After extensive review of the physicians' depositions, as well as the physical therapist's deposition, we find that the testimony of physical therapist Douglas Roll and of Drs. Smith and Smoot are inextricably intertwined with the issue of the videotape. The deposition testimony of these men shows the videotape as a basis for their testimony and an influence of their analyses of the claimant.
¶ 18. Physical therapist Douglas Roll was questioned about the videotape.
Q. Assuming the claimant performed the physical activities demonstrated in the videotape, and assuming that the claimant demonstrated the further abilities shown on the functional capacity evaluation with regard to use of his left lower extremity as a power leg and to bear full weight on his left lower extremity, but assuming also that the claimant has represented to various physicians, including Dr. Gorman who is a neurologist in Biloxi, Dr. Butler who is an orthopedic surgeon in Slidell, Dr. Sydney Smith who is a neurologist in Gulfport, and Dr. Smoot who is a psychologist in Biloxi, that he is unable to walk without the use of crutches, taking all of that into consideration, does that cause you to have some concerns regarding the credibility of the claimant in this case?
A. After viewing the videotape and comparing what I saw in the videotape to what I saw during the functional capacities evaluation, I would have to say there is a credibility problem.
Dr. Smith noted when questioned about the videotape:
A. Based on my examination, my review of the videotape, my review of the depositions, and the hypothetical situation that you presented to me, I would think the most likely diagnosis is malingering for compensation.
Dr. Smith further noted:
A. The review of the videotape showed that he could walk around just fine, moving his toes, dorsiflexion and plantar flexion. And the weight of that is that the man is malingering, intentionally trying to mislead us, for compensation reasons probably since this lawsuit is here.
Dr. Richard Smoot was also questioned about the videotape. Dr. Smoot stated that he observed the claimant "walking without the assistance of his crutches."

*968 A. During my interview with Mr. Cook, he indicated that he was unable to use his left lower extremity since his accident.
Q. Since his accident. All right. And what did you observe in the videotape that you looked at?
A. What I observed in the videotape was that he was walking without the assistance of his crutches.
Of deeper concern is the testimony of Dr. Butleras he was the physician relied upon most by the administrative law judge in forming her conclusions on the issue of impairment. By deposition Dr. Butler seemingly presents credible evidence by which the administrative law judge could have relied. However, upon closer inspection of the recordspecifically the questions posed to Dr. Butlerit is apparent that his testimony was influenced by reference to the "videotape" and statements referencing the physical therapist's assessment of the claimant in light of the videotape.
Q. The physical therapist further testified that in his opinion the claimant exhibited symptom magnification, and the physical therapist after examining the claimant and reviewing the videotape which I think you reviewed also; is that correct?
A. I believe I did review a videotape of him.
The casino's attorney further stated:
Q. And assuming further that the physical therapist after examining the claimant for the two day functional capacity evaluation in October of this year and reviewing the videotape stated he was not able to assess the claimant's true physical abilities and stated, "I would have to say there was a credibility problem."
The casino's attorney requested that he would like for Dr. Butler to assume that Dr. Smoot evaluated the claimant and that Smoot testified "that the claimant said he was unable to use his left lower extremity since the date of the accident, but his actions demonstrated on videotape were inconsistent with what he represented."
¶ 19. As we can see, the questions posed and the facts Dr. Butler was asked to assume were laced with reference to the videotape taken of an individual purported by the employer to be Christopher Cook. We appreciate the attempt of the administrative law judge to fairly assess and eliminate the impact of the videotape from the medical evidence, but we find the administrative law judge's conclusion is not supportable by substantial credible evidence.
¶ 20. By excluding the testimony of Drs. Smoot, Smith, and Butler, and the physical therapist, Douglas Roll, we are left with the testimony of Dr. Gormanthe physician who deferred the claimant's impairment rating to Dr. Butler. Returning to the record, we find that Dr. Gorman was not influenced by the videotape. His remarks centered on the claimant's injuries that he was suffering from reflex sympathetic dystrophy for which he (Dr. Gorman) prescribed treatment and the maximum medical improvement date of November 7, 1994, the date the administrative law judge adopted in her findings. Under these circumstances, our only course of action is to rely on Dr. Gorman's evaluations of the claimant. Therefore, we reverse and remand for calculation of damage to the claimant's foota scheduled member.
¶ 21. Because we have eliminated the testimony of the physiciansexcluding Dr. Gormanand because we have eliminated the testimony of the physical therapist, we find it unnecessary to rule on the application of the rule found in Scott v. Flynt, 704 So.2d 998 (Miss.1996), and we find it unnecessary to rule on the issue concerning M.R.E. 403.
¶ 22. Having stated such, we find this citation of error to be of merit.

II. WHETHER THE CLAIMANT WAS NOT PRECLUDED FROM RECOVERY ON HIS FOOT (A SCHEDULED *969 MEMBER) BASED UPON HIS FAILURE TO DEMONSTRATE AN ACTUAL LOSS OF WAGE EARNING CAPACITY.
¶ 23. Contested in the present case is the formula to be employed in determining compensation, if any, above that which was granted by the administrative law judge, and whether that injury is permanent partial in nature. As indicated above, there is no contest that the claimant suffered a temporary total injury.
¶ 24. The employer insists that this Court employ the "loss of wage earning capacity" calculation following the rationale of the circuit judge who reviewed this case on appeal. The claimant argues that the "loss of wage earning capacity" calculation is unwarranted in determining injury to a scheduled member. Smith v. Jackson Construction Co., 607 So.2d 1119, 1126 (Miss.1992). Specifically, the employer and carrier propose that we adopt Coulter v. Harvey, 190 So.2d 894 (Miss.1966) (skin rash "contact dermititus"); Thompson v. Wells-Lamont Corp., 362 So.2d 638 (Miss. 1978) (infectious asthma); Pontotoc Wire Products Co. v. Ferguson, 384 So.2d 601 (Miss.1980) (respiratory ailment); and Piper Industries, Inc. v. Herod 560 So.2d 732 (Miss.1990) (skin rash "contact dermatitis") as authority for denying Cook permanent partial disability benefits. These cases concern non scheduled member injuries. Considering the injury presented in the record, there is no merit to the employer's argument.
¶ 25. Cook emphasizes that the administrative law judge and the Commission employed the same rationale as the circuit judge and that rationale is incorrect.
¶ 26. Cook writes:
The A.L.J., Commission and the Trial Judge (on appeal) erroneously applied the rule in Coulter vs. Harvey, 190 So.2d 894 (Miss.1966) and Coulter's [progeny] (stare decisis) to bar Claimant from receiving any permanent partial disability recovery due to his "lack of Proof of Post MMI Wage Earning Efforts."
¶ 27. We agree. The Workers' Compensation Act "arbitrarily schedules the compensation payable for loss of or loss of use of a scheduled member, focusing upon a claimant's functional loss and without regard to loss of wage earning capacity." Smith, 607 So.2d at 1126. Certainly, this point can be stated no more concisely, and because the Commission has misapprehended the legal principle to be employed, our review is de novo. Id. at 1125.
¶ 28. Cook injured his foot, and under the Act, the foot is considered a scheduled member. See Miss.Code Ann. § 71-3-17(c)(4) (Rev.1994). Because the foot is a scheduled member, no account is taken as to the claimant's loss of wage earning capacity.[5] Thus, it is immaterial whether Cook attempted to or failed to find employment after reaching maximum medical improvement. The permanent partial disability, if any, of a claimant's scheduled member, is calculated by the percentage of impairment rating times the number of weeks, subject to the maximum on the schedule.
¶ 29. However, as indicated above, Dr. Gorman said he was permanently impaired but deferred the setting of the rating to Dr. Butler. Dr. Butler placed no permanent impairment rating on Cook, stating that Cook could return to his previous employment. We do note that our decision necessarily dictates that this case be reversed and remanded for reconciliation of this inconsistency since the finding of the administrative law judge was based on insufficient evidence and an improper finding that loss of wage earning capacity is an element in the determination of permanent impairment of a scheduled member.

CONCLUSION
¶ 30. Because the administrative law judge employed incorrect law in resolving *970 this case (no proof of loss of wage earning capacity), and further because she based much of her decision on the information of Dr. Butlerwhose testimony was cemented by hypothetical questions based on the videotape and testimony surrounding the videotapewe remand for determination based upon the correct legal principles as noted in this opinion and for an impairment rating in line with the untainted medical evidence.
¶ 31. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS REVERSED AND REMANDED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLEES.
KING, P.J., BRIDGES, DIAZ, IRVING, AND LEE, JJ., CONCUR.
SOUTHWICK, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J., COLEMAN AND THOMAS, JJ.
SOUTHWICK, P.J., dissenting.
¶ 32. The majority reverses and remands to award benefits to Christopher Cook. I agree that we must send this case back to the Commission, but I believe the majority has improperly rejected all of the employer's evidence, made its own credibility choice on the claimant's, and held that benefits must be awarded. Instead, if not for a single piece of improper medical evidence that was relied upon to support the Commission's findings, we should affirm. Only one piece of evidence was relied upon that was tainted by the witness first having been shown a videotape. Even without that evidence, the Commission might still find that the claimant did not prove his right to permanent benefits. We should reverse, remand, and permit the Commission again to make its determinations.
¶ 33. At the hearing before Administrative Judge Linda Thompson, the issue of whether the person in the video was the claimant Cook or his brother was the initial question. Cook and his brother were both present. After viewing the video and each brother, the administrative judge said, "I can't be certain because these two men look a lot alike," but finally determined that the person on the tape likely was not the claimant. Administrative Judge Thompson agreed to admit the medical depositions but stated that she would "disregard that testimony directly involving opinions made or comments made after viewing the videotape, but I can't imagine that would negate all of the rest of the findings" that were made. Her confidence was based on the fact that all the examinations and diagnoses were performed prior to the video being prepared. Whether such an exercise in culling through the evidence was successful is the initial question on appeal. A separate question is that regardless of the success in separating wheat from chaff in the depositions, whether the claimant himself ever proved his case. What must be kept in mind is that this was Cook's case to prove, not the casino's to disprove.

DISCUSSION

1. Depositions should have been completely stricken
¶ 34. The administrative judge stated that though she would not physically black-line out the offending parts, she agreed only to admit such portions of the medical depositions as were unaffected by the video. What evidence to admit and the weight to be given it is initially for the administrative judge, and whether that evidence is convincing is for the Commission itself. White v. Superior Products, Inc., 515 So.2d 924, 927 (Miss.1987). Here the Commission affirmed the findings of the judge who conducted the hearing. Our decision should turn on whether there is something reversibly erroneous in the procedure followed and whether the evidence unaffected by the doctors' view of the video supports the Commission's actions.
¶ 35. No one cites any procedural doctrine that evidence that is tainted in any *971 way must be excluded in its entirety. This is not a constitutional criminal procedure issue, in which an improperly gained confession or evidence from a tainted search must be excluded completely. In fact Cook presents his argument in terms of Rule of Evidence 403, which requires a balance by the trial judge between the probative value of evidence and its unfairly prejudicial effect. M.R.E. 403. There is no jury here, and the principal question is whether the testimony and records of the physicians, all of whom examined the claimant and made diagnoses prior to seeing the video, contain adequate untainted portions.
¶ 36. A problem the administrative judge faced at the March 14, 1996 hearing was that the ability of the employer to obtain other evidence at that stage was considerably limited by the fact that the issue that the claimant was not the person on the video was not raised until February 29. According to the employer's response, the video had been provided "long ago" and this motion was the first indication that there was any defect in the tape. I do not discover in the record when the video was provided to the claimant's attorney, but at least by the time of therapist Douglas Roll's November 16, 1995 deposition the video had been disclosed. The depositions of the other doctors who found no permanent injury were taken later.
¶ 37. This means that by November 1995 and perhaps well before that date, the claimant had knowledge that there was video purporting to show him working on a vehicle without any apparent physical limitations. Not until two weeks before the workers' compensation hearing did the claimant assert that it was his brother who was depicted. Thus to the extent each deposition is "infected" with references to the video, the party with knowledge of the alleged error that is central in this appeal remained silent while that evidence was developed. Perhaps that seemed good tactics. Cook may not have been obligated to point out to the employer the mistake it had made. However, Cook's permitting these depositions to be taken with that error being held in silent reserve does suggest that the administrative judge should be granted considerable discretion in resolving the problem.
¶ 38. Fortunately the administrative judge herself was aware of the defect and we are not required after-the-fact to unravel an evidentiary mess. The judge who received the evidence figuratively took scissors to the depositions. She stated that any answers affected by the videotape were excluded. Thus all that was effectively introduced were the tattered remains of the depositions. Even though there was no literal scissor-cutting or black-lining, we can determine what the administrative judge considered untainted by examining what she relied upon in her detailed opinion. The majority goes far beyond what is justified in rejecting it all. I review each medical witness's deposition and what the administrative judge pulled from that testimony to form her written opinion.
¶ 39. The goal was to find the parts of the depositions that represented each doctor's conclusions based solely on the examinations and diagnoses. The evidence from one of the doctors was easily differentiated since he prepared a written report the day after the examination and a later follow-up report after the video was viewed. For the other doctors, the more difficult task is to determine whether some of the answers to questions are expressed in such a way as clearly to be the doctor's pre-video views. The administrative judge stated in her opinion that she relied upon the medical "findings made upon examination or evaluation before being shown the videotape." If that effort was both factually possible and successful, I find no error in the approach.
¶ 40. I note that technically we are reviewing the Commission's affirmance of the administrative judge's ruling. Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1245-46 (Miss.1991). However, the Commission *972 order makes no independent findings and merely affirms the administrative judge. We should rely on the sifting performed by the administrative judge.
¶ 41. The administrative judge's opinion relies heavily on the deposition of Dr. James Butler. After a few remarks opening the deposition, the President Casino's attorney gave a two-page statement of assumptions that he wished for the doctor to make in his answers. Among those assumptions was the existence of a videotape showing Cook to be a malingerer. However, many of Dr. Butler's answers clearly excluded the videotape. For example, Butler said that after a March 2, 1994 office visit he dictated a note that he did not think Cook "has significant functional impairment as he implies." Then the attorney reminded the doctor of the previous assumptions that were detailed, and asked when maximum medical improvement was reached. The answer was that "according to my records I assessed him" as reaching MMI on March 2, 1994. Both of those answers are usable since the doctor made it evident that he was repeating back from notes that predate seeing the video. However, the administrative judge accepted another doctor's later date for MMI.
¶ 42. Neither answer is as important as the next, though, when the doctor again is asked to make various assumptions including the accuracy of the video, and is asked whether Cook has any permanent injury. Dr. Butler answers that "based on objective criteria" Cook does not have any impairment rating and could return to work. The phrase "objective criteria" does not appear to be some medically precise term that refers perhaps to a doctor's own observations of a patient and which would exclude extraneous matters such as the video. I assume the phrase is plain English and the video qualifies as "objective." The administrative judge relied on this statement from Butler, which implicitly is a finding that Dr. Butler's testimony about an impairment rating was not tainted by the video. Though it is possible that Dr. Butler was indicating that only his own examination was the source of his conclusion regarding Cook's condition, the answer was too ambiguous on that point for us to accept that Dr. Butler's answer regarding an impairment rating could be considered.
¶ 43. Another conclusion relied upon by the administrative judge is Dr. Butler's referring to the diagnosis that he made prior to seeing the video that Cook did not suffer from the condition of reflex sympathetic dystrophy as Dr. Gorman had found. That also was untainted evidence.
¶ 44. The administrative judge's opinion next refers to statements from Dr. Sydney Smith's deposition. None of those references in the judge's opinion are tainted because they are what Dr. Smith's diagnosis was at the time that he saw Cook. Smith says that his examination found no "organic basis" for Cook's complaints. All such statements come from the cross-examination, when Cook's lawyer is reviewing Smith's treatment.
¶ 45. The third medical witness who found no permanent injury was physical therapist Douglas Roll. The administrative judge's opinion quotes Roll as saying that during his exam Cook appeared at times to be able to bear his weight totally on his allegedly still-injured left foot. He demonstrated "giving way" behavior, meaning he was not performing the strength and other tasks to the maximum effort as the therapist was requesting. Roll thought that Cook was magnifying his symptoms and had nonorganic responses to sensory testing. These answers were given before Roll was asked to consider the video. Therefore I find no error in the administrative judge relying upon them.
¶ 46. The final medical witness supporting the employer's view was Dr. Richard Smoot, a clinical psychologist. He performed a psychological assessment and determined that Cook was likely to have "somatic complaints," meaning complaints regarding his physical health, and to exaggerate *973 symptoms. Dr. Smoot was clear that "somatic" should not be confused with psychosomatic, and that an individual with "somatic complaints" may or may not have a physical origin for them. He also viewed the video, but the conclusions used in the administrative judge's opinion were those he made at the time of the examination and were contained in a report prepared the day after Dr. Smoot's examination. He reviewed the video a few weeks later and submitted a follow-up report. Therefore the untainted portion of Dr. Smoot's diagnosis is easily discovered. The only reference to this examination made by the administrative judge was that "Cooks's psychological profile was that of one who exaggerates physical symptoms and is histrionic." Those findings are consistent with the initial written report, which uses that language except for the word "histrionic."
¶ 47. Interestingly, the end of Smoot's initial written report states that medical records provided to Dr. Smoot indicate that a video exists revealing Cook walking without noticeable pain. Dr. Smoot states that if such a video existed this would be consistent with his medical conclusion that Cook's personality is such as to exaggerate physical problems. This is in essence what the administrative judge determined about the other doctors, that their original diagnoses and conclusions were not altered by seeing the video.
¶ 48. Cook discusses a supreme court decision in which ex parte contacts with medical doctors are prohibited. Scott v. Flynt, 703 So.2d 864 (Miss.1997). Here, the administrative judge in fact rejected the evidence arising from the results of the ex parte contact. The Flynt decision does not stand for the proposition that the results of examinations conducted by a medical doctor are automatically excluded, if that doctor after reaching his medical conclusions is contacted ex parte. Even criminal law does not make such blanket prohibitions, as the evidence must be the product of the improper conduct before it is excluded. New York v. Harris, 495 U.S. 14, 19, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). If the evidence is free from that taint, it is admissible. Id. As already indicated, I also find no problem in this judgetried case under M.R.E. 403, which requires a balance between the probative value and the prejudicial effect of evidence.
¶ 49. I find that the administrative judge was admirably diligent in sifting the depositions and finding the usable, untainted evidence. The one exception is the statement from Dr. Butler that Cook could return to work on March 2, 1994. Though Dr. Butler may have been referring to the opinion that he developed and recorded at the time of the physical examination, that is not apparent from the testimony. Therefore this statement should not have been considered.
¶ 50. Whether that one improper piece of evidence invalidates the Commission's judgment may be academic. This evidence did not need to disprove the claimant's case. To award benefits, the Commission must have evidence from the claimant. The administrative judge's opinion, affirmed by the Commission, held that there were "no objective medical findings to support Cook's claim of permanent occupational or medical disability." I turn to Cook's next issue in reviewing the strength of the evidence for, not against, the claim.

2. Evidence supporting permanent disability
¶ 51. Cook argues that the Commission required that he prove that he made reasonable efforts to find other employment. There was no such evidence in the record, but there is only a passing reference in the administrative judge's opinion to the point. Cook argues that the following sections of the administrative judge's opinion, affirmed by the Commission, did require that he seek other employment before being awarded permanent benefits:
4. ... It is difficult to know when Cook reached maximum medical recovery because *974 Cook continues to allege temporary total disability in spite of the lack of objective findings to support his contention. [She refers to Dr. Butler who set MMI as March 2, 1994; Gorman as November 7, 1994. Dr. Gorman did not find malingering.]
5. Cook has not made any efforts to return to work since being released by Dr. Butler on March 2, 1994, and by Dr. Gorman on November 7, 1994, and his claim of not being able to return to work or walk or stand without crutches is simply not credible in light of the medical testimony. There are no objective medical findings to support Cook's claim of permanent occupational or industrial disability. Dr. Smith said the coldness and swelling of the left foot could be attributed to disuse of the foot. [Psychological profile was of exaggerator of symptoms.] Dr. Gorman, a neurologist, who thought Cook suffered from reflex sympathetic dystrophy, deferred to Dr. Butler, the orthopaedic surgeon, for an impairment rating, and Dr. Butler did not assign one. Dr. Butler and Dr. Smith, another neurologist, did not suffer from reflex sympathetic dystrophy. Dr. Butler further said Cook could return to his prior employment.
¶ 52. Both of the first two sentences of paragraph 5 appear to be discussing the absence of evidence to support "permanent occupational or industrial disability." Depending on the relief that Cook sought, he might need to prove that he sought other employment. Before I examine whether the Commission was requiring that Cook have sought other employment, I try to determine what relief Cook sought.
¶ 53. In a worker's compensation claim, the petition to controvert is the most formal setting out of the claim. Various sections of the petition form used here were completed by stating that information was unknown, including the period of temporary disability, the date of MMI, the date able to resume employment, and the degree and extent of permanent disability. Perhaps some of this was amplified in discovery, but little information about discovery is in the record. Therefore I turn to an examination of the evidence at the hearing to determine what relief Cook wanted.
¶ 54. Dr. Gorman testified that Cook was totally disabled from his occupation. This doctor would not give a percentage of medical impairment of the foot, but he did state that because of the partial or total loss of use of his foot that Cook was unable to continue in the same employment that required continuous walking through the parking lot.
¶ 55. Therefore, since Cook introduced medical testimony that he was unable to continue in the same employment, it would appear that he was alleging that his loss of use of a scheduled member, his foot, had made him "unable to do the substantial acts of the employment of which he was engaged when injured." McGowan v. Orleans Furniture, Inc., 586 So.2d 163, 168 (Miss.1991). In McGowan, there was some evidence that the claimant's medical impairment equaled a 40% loss of use of his leg; however, since the evidence supported that he was no longer able to engage in the normal acts of his employment, this was considered a total industrial loss of use of that member. Id.
¶ 56. Why inability to perform the substantial acts of the prior employment equates to a total loss of use of the scheduled member is not altogether clear. Depending on the member and the nature of the claimant's work, a total loss of use might not translate into a physical inability to perform the necessary tasks of that position, but the claimant is still entitled to the full benefits for that loss. Miss.Code Ann. § 71-3-17(c) (Rev.1995). Even so, the scheduled member sections of the statute are an effort to simplify compensation claims by creating firm entitlements for injuries to scheduled members. The benefits may compensate some specific claimants' injuries more justly than another claimants' similar injuries, but the legislative *975 decision was to simplify these claims in order to make the entire scheme operate more efficiently.
¶ 57. In one of the early cases in which this language of "substantial acts of the employment" for scheduled member claims was adopted, the court in describing the claimant stated that it was "most unlikely that he will be able to pursue any other gainful employment." M.T. Reed Construction Co. v. Martin, 215 Miss. 472, 477-78, 61 So.2d 300 (1952). The language of "substantial acts of employment" was taken from private disability insurance cases in which the insured was seeking benefits for total disability. Id. Therefore, the origin of the standard has little to do with scheduled member injuries. In fact, M.T. Reed was overruled to the extent that it limited a claimant who was permanently and totally disabled from any work, just to scheduled member benefits. Smith v. Jackson Construction Co., 607 So.2d 1119, 1128 (Miss.1992) (functional loss of use of hand amounted to a total industrial disability). For total loss of use of a hand, the benefits are 66 2/3% of the average weekly wage for 150 weeks. Miss.Code Ann. § 71-3-17(c)(3). Instead, the claimant in Jackson Construction was entitled to 450 weeks of benefits for total disability. Id., relying upon Miss.Code Ann. 71-3-17(a).
¶ 58. The question becomes, then, whether after the Jackson Construction case partially overruled M.T. Reed, whether a claimant who seeks the maximum benefits for total loss of use of a scheduled member but does not have a 100% medical impairment to the member must show that he cannot perform the normal acts of his former employment. And even if that must be shown, is it necessary to show that the claimant sought to return to work? Here Cook put on no evidence of the percentage impairment, but Dr. Gorman testified that Cook could no longer work at his old job.
¶ 59. One observer has stated that the appropriate rule includes whether the combined evidence regarding medical impairment and occupational impact supports that the claimant's injury "has substantially the same effect on the worker's ability to perform the usual occupation as total loss of use of the member." JOHN R. BRADLEY, Measuring Benefits for A Scheduled Member: Enough to Trip Workers Compensation's Newest Player, in EIGHTH ANNUAL WORKERS' COMPENSATION PRACTICE & PROCEDURE SEMINAR 25 (1995). In the same paragraph Professor Bradley also stated that the case law held that when a partial impairment to a scheduled member renders a worker unable to perform the substantial acts required in that worker's usual occupation, then the worker was entitled to the same benefits as for total loss of that member. Id.
¶ 60. The problem with the first quoted part of that synthesis of the case law is that depending on the job and the scheduled member, a total loss of use of a member may have no impact on the worker's ability to perform the usual occupation. The claimant is nonetheless entitled to total scheduled member benefits because those benefits do not consider job impact. Id. at 20. Therefore, even the slightest impairment of that scheduled member would have the same impact as a total loss of use in that job, which is none. Under the suggested standard, that same claimant for even a modest impairment to a scheduled member would also be entitled to the maximum benefits.
¶ 61. I find Professor Bradley's analysis quite informative. He collected a wide array of the scheduled member cases in which a partial impairment had the same effect as a total loss of use. Id. at 23-29. He is correct that the central issue is whether a partial impairment to a scheduled member has caused a worker no longer to be able to perform the substantial acts of the former employment. In that event, he is entitled to the same benefits as for a total loss of use. What may be a slight over-simplification is that the Commission should ever look just to whether a *976 partial impairment has the same effect on the ability to perform those acts as does a total loss of use. Without worrying about impact on the ability of a worker to perform his job, the statute permits a certain level of benefits for the total loss of use of a scheduled member. The case law seems clear that when less than a total loss of use is involved, the maximum benefits are available only if that claimant can no longer perform the substantial acts of the former employment as the article itself concludes. Id. at 25.
¶ 62. The terminology is important. It suggests that maximum benefits for total loss of a scheduled member may be available even if the claimant could work at other jobs. In contrast, before permanent total disability benefits are available, the claimant must not only be unable to perform the substantial acts of his employment but must be totally and permanently unable to "earn the wages which the employee was receiving at the time of the injury in the same or other employment...." Miss.Code Ann. § 71-3-3(i) (emphasis added). The fact that Cook here was unable to walk around a parking lot anymore did not mean he was permanently disabled from any employment. Though some authorities use the terms interchangeably, e.g., VARDAMAN S. DUNN, MISSISSIPPI WORKMEN'S COMPENSATION § 74 (1990) at 87-88, the supreme court when faced with the distinction has held that the claimant must not have an ability to earn wages in any job. See, e.g., Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1249 (Miss. 1991) (claimant "must make a reasonable effort to secure other comparably gainful employment"). The statutory definition of disability is "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment," which "means that the claimant must seek, after the disability subsides, employment in another or different trade to earn his wages." Coulter v. Harvey, 190 So.2d 894, 897 (Miss.1966), cited in Pontotoc Wire Products Co. v. Ferguson, 384 So.2d 601, 604 (Miss.1980).
¶ 63. The reasonable interpretation is that a dichotomy has been created. First, benefits for a total loss of a scheduled member are to be awarded if a partial loss results in the inability to perform the "substantial acts required of him in the performance of his job." On the other hand, if someone is seeking benefits outside the scheduled member scheme, it is necessary to show that the disability has had an impact on the claimant's capacity to earn wages in the same or other employment.
¶ 64. Applying that law to the present facts, I find that Dr. Gorman testified that Cook was unable to perform the normal acts of his former employment. He was unwilling to state a percentage medical impairment. I do not find that failure fatal so long as adequate proof was introduced and accepted by the fact-finder that Cook was unable to perform those former acts. It is in that context that the contested statement in the administrative judge's opinion should be read. I repeat the section:
Cook has not made any efforts to return to work since being released by Dr. Butler on March 2, 1994, and by Dr. Gorman on November 7, 1994, and his claim of not being able to return to work or walk or stand without crutches is simply not credible in light of the medical testimony. There are no objective medical findings to support Cook's claim of permanent occupational or industrial disability.
The finding could be seen as responding to both kinds of claims, both that Cook was disabled from his normal occupation because of a scheduled member injury and that he was totally disabled because of the same injury. My interpretation of Dr. Gorman's testimony is the same as in the administrative judge's opinion, namely, that he was supporting a total disability claim for Cook as well as a loss of use of the foot that rendered him unable to perform his former job. I find no error in the *977 statement of the law in the administrative judge's opinion.
¶ 65. The issue then is whether evidence is needed that a claimant has sought to return to work when he is arguing that if he did so, he could not perform the substantial acts of his former job. It would appear that Cook has not sought to return to work at the casino. Therefore there has been no evidence, even if Cook has a continuing injury, of whether there is a way to accommodate any limitations that he might have. All the physicians who spoke on the issue stated that he had reached maximum medical improvement. If there had been medical testimony that Cook had a one hundred per cent or some lesser permanent medical impairment to his foot, then evidence regarding seeking further work would not have been necessary to receive benefits. The percentage impairment if accepted would have become the basis for awarding a percentage of permanent benefits.
¶ 66. As to whether seeking further employment is needed, the employer points to a case in which a claimant apparently soughtthe case does not explicitly define the relief soughtpermanent disability benefits based on an injury that had a greater occupational impact than the actual functional impairment. Walker, 577 So.2d at 1244-45. The most any medical professional stated was that the physical impairment to the claimant's hand was five percent. Id. at 1245. The evidence proved that the claimant had even been offered his former job but had refused. Based on testimony by the claimant regarding his physical limitations, the administrative judge awarded benefits based on a forty per cent industrial loss of use. The Commission reversed and limited benefits to the schedule for a five per cent impairment to the hand. Id.
¶ 67. In agreeing that the Commission was correct just to limit the claimant's award by his percentage of medical impairment, the supreme court relied on several factors. The claimant had not presented any evidence that after he reached MMI, that he had unsuccessfully sought to return to his former duties. Id. at 1248. Secondly, there was no corroboration to the claimant's testimony that he was unable to work. Finally, there was no evidence that the claimant had been refused work elsewhere because of the injury to his hand. Id. The court then observed that a claimant "must make a reasonable effort to secure other comparably gainful employment." Id. at 1249. The claimant had been offered his former job back at his employer at the same pay, but he refused. Id. at 1244. The court also required that the claimant seek work within a reasonably-large area"he must cast his eyes further than across the street." Id. at 1249.
¶ 68. Each of these statements must be kept in context. I consider the reference to seeking other employment or to returning to his former job to mean that no basis had been shown to go beyond the claimant's entitlement to benefits based strictly on his percentage medical impairment to his hand. The Walker court concluded by holding that the Commission could have found that the claimant "experienced no permanent partial impairment, in which event his compensation becomes a function of his five percent medical impairment...." Id. The court was clear that none of this evidence is needed if the claimant is satisfied to receive benefits based on his medical impairment:
Where the injury has not rendered the employee permanently totally occupationally disabled, the Act arbitrarily schedules the compensation payable for loss of or loss of use of a scheduled member, focusing upon a claimant's functional loss and without regard to loss of wage earning capacity.
Id. at 1247-48. In other words, in order to gain benefits based on the medical evidence of functional impairment, no other evidence is needed. To acquire more benefits than that, other proof is required.
*978 ¶ 69. Had medical evidence been received regarding a percentage impairment, Cook would have been entitled to those benefits unless the fact-finder rejected the evidence as not credible. Miss.Code Ann. § 71-3-3(i) (Rev.1995); Penrod Drilling Co. v. Etheridge, 487 So.2d 1330 (Miss. 1986) (medical testimony is needed for the extent of the disability). No such evidence is in the record and an award for a percentage medical impairment simply cannot be made.
¶ 70. Next, for Cook to receive benefits based on his inability to perform the substantial acts of his employment, then he must put on evidence to support that claim. The supreme court in one precedent noted that the claimant "has not attempted to return to work nor does he offer testimony from anyone else as to the effect his injury has had on his ability to perform his work." McGowan, 586 So.2d at 168. Nonetheless, the court concluded based on its own review of the evidence that the claimant was unable to perform a large number of the tasks of his former job. It therefore awarded benefits based on a total loss of use of that scheduled member. Id.
¶ 71. As Professor Bradley indicated in his review of these cases, often the supreme court has referred to evidence that a claimant had sought but failed to gain other employment, but the court did not hold that such evidence was necessary for either side. BRADLEY, Measuring Benefits for A Scheduled Member, at 27-29. McGowan's ruling for the claimant despite the absence of such evidence is not necessarily inconsistent with the Walker decision of the same year that upheld the Commission in part because of the absence of such evidence. Evidence of seeking one's former job or other employment is at least relevant to the degree of disability caused by an injury, even if that proof is not required. Especially when the issue is whether a claimant can no longer perform the normal acts of the former job and whether any reasonable accommodation to an injury can and would be made by the employer, such evidence seems quite useful. Nonetheless, we are bound by McGowan that the absence of such evidence does not end the possibility of relief even when the claimant is arguing that a partial loss of use of a scheduled member has left him unable to handle the acts of his former employment.
¶ 72. Therefore if credible evidence of inability to perform in his former employment had been introduced, it would not be rendered unusable just because Cook did not seek to return to that job. The administrative judge properly discussed what evidence did exist. Failure to seek work is not a bar to recovery for this claim, but nothing prevents a fact-finder from making common sense observations about what the evidence does and does not prove.
¶ 73. I finally turn to whether the properly received and considered evidence supports the denial of benefits. The employer argues that there was no medical testimony proving a percentage impairment. That is true, but as just described Cook could receive benefits regardless of the percentage impairment if he could not perform the substantial acts of his former employment. Moreover, the proof on that latter question is not only what was stated by Dr. Gorman:
The Commission is not confined to medical testimony in determining the percentage of loss to be assigned to an injury. Malone & Hyde of Tupelo, Inc. v. Kent, 250 Miss. 879, 168 So.2d 526 (1964). Lay testimony may be considered to supplement medical testimony but "[t]he probative value of any witness' testimony is for the fact-finder to determine." R.C. Petroleum, Inc. v. Hernandez, 555 So.2d 1017, 1021 (Miss. 1990).
McGowan, 586 So.2d at 167. Here, Dr. Gorman stated that he would not give an impairment rating but he thought Cook could no longer work at his old job. Cook himself testified as to the job requirements, which included walking throughout *979 the large parking lot at the casino. He testified that he had not worked since the injury, and in an interrogatory answer stated that he had not sought employment. Cook stated that he had never been fired by the casino, but he could no longer perform the "activities or the type of requirements that [he] had as a security guard."
¶ 74. This constitutes evidence that a fact-finder could have but would not have been required to accept that Cook had a continuing foot injury that rendered him unable to perform the substantial acts of his employment at the time of his injury. It is evident that the fact-finder did not accept the evidence. The employer presented testimony that the continuing swelling and coldness of the foot were likely caused by Cook's failure to use his foot, a diagnosis Dr. Sydney Smith made without "benefit" of viewing the video. The administrative judge relied on that testimony and also on Dr. Butler's deposition testimony that Cook could return to his former job.
¶ 75. I discussed Dr. Butler's statement in the first issue and the ambiguity about what Dr. Butler relied upon in making that conclusion. Perhaps he was relying solely on his examination, but the employer's attorney asked that he also consider the video that later was shown likely to be of Cook's brother. Therefore I find that the one problem piece of evidence was some of the strongest evidence on precisely the issue upon which the entitlement to benefits for a permanent loss of use of a scheduled member turns. I find that to have been a potentially outcome-controlling error.
¶ 76. What the valid evidence would have permitted is an award of benefits based on an inability to perform the substantial acts of the former employment. The Commission may have been correct in rejecting that evidence, but among the significant pieces of evidence for the contrary view was a statement from Dr. Butler that should not have been considered. Even without that statement from Dr. Butler, the Commission could have decided that the better, more credible evidence was that no permanent impairment existed. Since there was no evidence of a percentage impairment, the only award that would have been proper was either the denial of permanent benefits, which is what the Commission determined based in part on improper evidence, or else an award based on an inability of Cook to perform the substantial acts of the former position.
¶ 77. I would reverse and remand to the Commission for further proceedings but would make no judgment regarding what the range of proper awards might be at that time.
McMILLIN, C.J., COLEMAN AND THOMAS, JJ., JOIN THIS SEPARATE OPINION.
NOTES
[1] The record reflects that Dr. Butler reviewed the videotape on July 18, 1995.
[2] Dr. Gorman noted that he deferred the percentage of impairment to Dr. Butler based on the fact that Dr. Butler was an orthopaedic surgeon. Dr. Gorman is a neurologist. He stated that a few neurologists will do ratings but "I'm not one of them...."
[3] The record does not reveal the year in which Dr. Smith treated Cook.
[4] Dr. Smith noted that he did review the videotape. There is no date as to when he reviewed the tape.
[5] The "loss of wage earning capacity" test would be employed in this instance only if the claimant were occupationally disabled. Id. at 1128.