773 So.2d 380 (2000)
McCARTY FARMS, INC., a Wholly Owned Subsidiary of Tyson Foods, Inc., a Self-Insured, Appellant,
v.
CAPRICE BANKS, Appellee.
No. 1999-WC-00701-COA.
Court of Appeals of Mississippi.
June 13, 2000.
Rehearing Denied December 12, 2000.
*382 Leland S. Smith, III, Jackson, Attorney for Appellant.
Roger K. Doolittle, Floyd E. Doolittle, Jackson, Attorneys for Appellee.
Before SOUTHWICK, P.J., BRIDGES, and IRVING, JJ.
BRIDGES, J., for the Court:
¶ 1. Caprice Banks sustained an injury while in the course and scope of her employment with McCarty Farms, Inc. a wholly owned subsidiary of Tyson Foods. The Administrative Law Judge (ALJ) ordered Tyson Foods to pay Banks permanent partial disability benefits for the industrial loss of the use of her right arm for 140 weeks, permanent partial disability benefits for the industrial loss of the use of her left arm for 60 weeks, all medical services and supplies required by the nature of Banks's injuries, and a 10% penalty on any untimely paid installments of compensation. The Mississippi Workers' Compensation Commission (Commission) affirmed the ALJ's findings. The Circuit Court of Hinds County affirmed the Commission. On appeal to this Court, Tyson Foods presents the following issues:
I. THE COMMISSION'S DENIAL OF THE EMPLOYER AND CARRIER'S MOTION TO SUPPLEMENT WAS AN ABUSE OF DISCRETION WHEN THE ADDITIONAL EVIDENCE WAS CRUCIAL REGARDING THE CLAIMANT'S LOSS OF WAGE EARNING CAPACITY.
II. THE FINDINGS OF THE COMMISSION THAT THE CLAIMANT SUFFERED A 70% INDUSTRIAL LOSS OF USE OF HER RIGHT UPPER EXTREMITY AND A 30% INDUSTRIAL LOSS OF USE OF HER LEFT UPPER EXTREMITY IS NOT SUPPORTED BY THE SUBSTANTIAL EVIDENCE.
A. THE FINDING OF 70% AND 30% INDUSTRIAL LOSS OF USE IN THIS CASE IS CLEARLY CONTRARY TO THE PURPOSE UNDERLYING THE MISSISSIPPI WORKERS' COMPENSATION ACT, SPECIFICALLY, TO THE DEFINITION OF DISABILITY WHICH CONTROLS AN AWARD OF BENEFITS UNDER THE ACT.
B. THE CLAIMANT'S DISABILITY SHOULD BE LIMITED TO 15% AND 5% FUNCTIONAL IMPAIRMENT ABSENT A SHOWING BY THE CLAIMANT OF A LOSS OF WAGE EARNING CAPACITY IN THE SAME OR OTHER EMPLOYMENT AS A RESULT OF THE WORK RELATED INJURY.
C. THE RECENT DECISIONS OF APPEALS FURTHER DEMONSTRATE THAT THE FINDING BY THE MISSISSIPPI WORKERS' COMPENSATION FULL COMMISSION IN THIS CASE CANNOT STAND.
III. ABSENT THE ADMISSION OF THE CLAIMANT'S POST INJURY *383 WAGE EARNINGS, THE SUBSTANTIAL EVIDENCE FAILS TO SUPPORT THE FULL COMMISSION'S AWARD.
Finding no error, we affirm.

FACTS
¶ 2. On August 19, 1993, Tyson Foods employed Banks as a poultry processor. She performed different jobs at the employer's plant, including working on the KFC line, pulling fat, working on the wingett wheel, cleaning live chickens, grading paws, and labeling boxes. On March 15, 1995, she was hanging live chickens. The chickens were alive, and she used both hands to hang them on a shackle. These chickens weighed between five and eight pounds. She was required to use both hands to hang thirty-two birds per minute. Banks had been hanging chickens for approximately nine months prior to the date of her injury. Her starting salary was $7.20 per hour, and she was still making that same hourly wage at the time of her injury. Including overtime, she worked from forty to fifty hours a week. On March 15, 1995, Banks injured her right hand, arm and shoulder, and her left hand. She reported the injury to her supervisor and to the company nurse.
¶ 3. Banks was treated for bilateral hand pain by orthopedic surgeon Dr. Aubrey Lucas from December 4, 1995 to September 15, 1996 when she reached maximum medical improvement with a 15% permanent impairment to her dominant right arm and a 5% permanent impairment to her left arm. Lucas restricted Banks to lighter work than hanging chickens, including any work involving knives or scissors. Banks contacted Tyson Foods after she was released by Lucas. In October 1996, because the job as chicken hanger aggravated her symptoms, Tyson Foods reemployed her to line boxes, and grading paws three or four times when she was caught up with her work in the box department. She performed this job until December 1996, when the employer placed her on leave of absence. Banks testified that other, less senior employees were still lining boxes when she left.
¶ 4. Banks testified that she contacted Tyson Foods every week, then every month, and then every other month regarding her prospects for reemployment. She also testified that she went to the plant ten to fifteen times between December 1996 and August 1997, the month of the evidentiary hearing, seeking reemployment. Banks testified that the personnel manager, Debra Porter, told her that the employer had no job openings. She testified that she could label boxes for two to four hours, but that she could not perform any of the other previous jobs she had held with Tyson Foods. She did not seek other work until July 1997 because she believed that Tyson Foods would reemploy her when a job became available.
¶ 5. Although Banks had also had experience as a cashier, she testified that she could not perform this job because it required the repetitive use of her arms and hands. Banks unsuccessfully sought work at approximately forty different places besides Tyson Foods. The prospective employers were aware of her impairment and disability because she indicated as such on her applications. Some of the prospective employers interviewed her, and she disclosed that she was looking for light duty work that she could perform within the doctor's restrictions.
¶ 6. Banks testified that she was currently able to do some housework but that she cannot cut meat, lift heavy pans, and that she cannot lift her three-year-old son. She testified that she still had hand pain, that Lucas gave her a prescription for pain medication when she last saw him on July 29, 1997, and that she had a return appointment.
¶ 7. Deborah Porter, personnel manager at Tyson Foods, was called as a witness for the employer. Porter stated that her duties involved hiring, recruiting, and placing people. Porter testified that Banks was the least senior member in the box *384 lining department in December 1996, and that she was placed on a leave of absence at that time due to the elimination of several positions. She stated that she looked for another job for claimant between January 1997 and August 1997, and that the employer's vocational expert, Connie Chapin, did not contact her regarding Banks's prospects for reemployment at the plant during this time. Porter testified that Tyson Foods generally hired between eighty and ninety people a month.
¶ 8. Porter testified that Tyson Foods currently had a job for Banks which was a combination of two different jobs, paw grader and box labeler. As a paw grader, Banks would grade between forty to fifty paws a minute that traveled along a conveyor belt. Porter testified that she would perform this job for approximately six hours a day and then Banks would rotate and place labels on boxes for another two hours. Porter testified that Banks could begin the job at the time of the hearing, but at a lower pay scale of $6.85 and chicken hangers at that time earned $7.55 an hour.
¶ 9. On cross-examination Porter testified that Banks was performing a box lining job in December 1996 when she was placed on leave of absence. Before placing anyone on leave of absence, an employee's seniority was considered. Porter explained that when Banks was asked to leave Sherylynn Flowers was still performing the box lining job but was kept because of her seniority.
¶ 10. Connie Chapin was called as a witness for Tyson Foods. Chapin testified that she was a vocation case manager and her job was vocational rehabilitation counseling. She was retained by Tyson Foods on January 30, 1997 to find employment for Banks. Chapin contacted Banks through her attorney several times in February 1997; however, Banks's attorney declined Chapin's services.
¶ 11. Chapin concluded that Banks was employable and identified six employers in the Jackson area who were currently accepting applications for current openings. These included restaurants needing a fast food worker or cashier and one job was for a front desk clerk. Four of the jobs paid $4.75 an hour, one paid $5.15 an hour, and another paid $5.45. Chapin testified that she did not believe the work of a cashier at a fast food restaurant on County Line Road during lunch would involve the repetitive use of Banks's hands.
¶ 12. On rebuttal, Banks called Elisha Levitt, a labor representative for Tyson Foods. Levitt stated he kept seniority lists of employees that he received from Tyson Foods. He testified that Sherylynn Flowers, the person who was kept when Banks was put on leave of absence at Tyson Foods and was performing substantially similar work, was hired on August 3, 1994. Banks was hired on August 8, 1993.
¶ 13. The records of Banks's treating orthopedic surgeon, Dr. Lucas, showed that he first saw Banks on December 4, 1995. Prior to her visiting Lucas, Banks saw neurologist Dr. Don Carpenter who performed nerve conduction studies which showed mild to moderate right carpal tunnel and very mild left carpal tunnel syndrome. Banks told Lucas that her pain had decreased since she started making boxes as opposed to hanging chickens. She requested splints so she could continue to work.
¶ 14. On December 18, 1995, Banks continued to experience right hand pain, but she wanted to continue making boxes and defer surgery.
¶ 15. On January 8, 1996, Banks complained of continued pain in the palm of her right hand and wrist which radiated to the elbows and sometimes caused her fingers to go numb. The problems on the left hand were less severe. Lucas noted that her options were avoiding factory work, splinting, and surgery.
¶ 16. On January 30, 1996, Banks reported her symptoms were about the same as they had been in her previous visit. She *385 mainly complained of pain in her right wrist. She wanted to continue working and did not want surgery. Lucas gave her a note to return to work, and he scheduled her for a follow-up examination in three weeks.
¶ 17. Banks continued seeing Lucas throughout February and March 1996, when she reported that she had increased symptoms on the left side and then later her condition was unchanged. Lucas noted that "her employer did not let her return to work with previous note," so Lucas gave Banks another return work form. He noted that she had elected to return to lighter work than what she had done before.
¶ 18. On April 25, 1996, Lucas noted Banks had surgery on a finger for a non-work related injury. She had lacerated her right little finger and had to have the tendon and nerve repaired by Dr. Blevins. Banks related to Lucas that she had yet to be provided any lighter work by Tyson Foods as they discussed in February and March 1996. Lucas noted in his records that there was nothing he could do until Banks recovered from the tendon surgery, and she was instructed to return in two months.
¶ 19. Banks missed her June 24, 1996 appointment; however, she was seen again on July 23, 1996 for a re-check. Lucas noted Banks was having problems with both upper extremities. Banks had weakness of the thenar muscles on her right side with some atrophy. The left side was strong. Lucas diagnosed persistent carpal tunnel. Lucas noted that Banks was requesting to return to work at some lighter activity, such as lining boxes. Lucas advised Banks to limit repetitive work and to give some serious consideration to the carpal tunnel release on the right muscles. As Banks wanted to return to work lining boxes, Lucas wrote a note allowing her to perform that work.
¶ 20. On July 31, 1996, Lucas wrote Banks's counsel a letter assessing a 15% permanent medical impairment to the right upper extremity and a 5% permanent medical impairment to the left upper extremity. He identified her restrictions as "no knives, no scissors. Work needs to be lighter than hanging chickens. Lining boxes is okay."
¶ 21. Lucas's records showed he conferred with counsel for Banks and counsel for Tyson Foods on July 21, 1997. During the conference a videotape was shown of several jobs including labeling boxes, lining boxes, pulling tenders, and grading feet. Lucas concluded that the tender pulling job presented a high risk of aggravating her carpal tunnel syndrome based on the amount of repetition and force required. He stated that, generally, an acceptable position would involve rotation among two or three positions, excluding the pulling of tenders. Lucas asked for additional information regarding the accurate rate per minute, per hour and per day required to perform the other jobs. Counsel for Tyson Foods provided the information requested by Lucas on August 13, 1997. On August 14, 1997, Lucas wrote an addendum approving the job of box labeling which could be performed one to two hours a day. He also approved the job of grading feet.
¶ 22. Banks returned to work at Tyson Foods on August 23, 1997, after the hearing conducted by the ALJ. On February 13, 1998, Tyson Foods submitted a motion to supplement the record with Banks's earnings history since the hearing before the ALJ. This motion was denied by the Commission.

LEGAL ANALYSIS

STANDARD OF REVIEW
¶ 23. The standard for appellate review of compensation claims is narrow at best. It is well settled that "[t]he Commission is the ultimate fact-finder." Hardin's Bakeries v. Dependent of Harrell, 566 So.2d 1261, 1264 (Miss.1990). "Accordingly, the Commission may accept or *386 reject an administrative judge's findings." Id. Our review is limited to a "determination of whether or not the decision of the commission is supported by the substantial evidence." Delta CMI v. Speck, 586 So.2d 768, 772-73 (Miss.1991). "This Court will overturn a [C]ommission decision only for an error of law or an unsupportable findings of fact." Cook v. President Casino, 740 So.2d 963(¶ 16) (Miss.Ct.App.1999) (citation omitted).

DISCUSSION
¶ 24. We address all of Tyson Food's issues together as these issues are, to some extent, intertwined. In entertaining Tyson Food's assertion that the Commission erred in not allowing a supplementation of the record with Banks's post-injury wage earning capacity, we must consider whether wage earning capacity is a consideration necessary for determining permanent partial disability benefits for the industrial loss of the use of a scheduled member.
¶ 25. Our workers's compensation statutes guarantee a measure of compensation to an injured worker who suffers a permanent impairment to a scheduled member as the result of a work-related injury. See Miss.Code Ann. § 71-3-17(c) (Rev.1995). An arm is a scheduled member as contemplated by this statute. See Miss.Code Ann. § 71-3-17(c)(1) (Rev. 1995).
¶ 26. Mississippi jurisprudence "shows that an employee suffering an injury to a scheduled member that results in a permanent partial disability to that member is entitled to the greater amount of compensation determined under two alternate theories of computation." Hollingsworth v. I.C. Isaacs and Co., 725 So.2d 251(¶ 10) (Miss.Ct.App.1998). "First, a determination of functional disability of the member must be made...." Id. Then the derivative mathematical formula for "the appropriate level of compensat[ion][is] computed by multiplying the percentage of disability times the maximum number of weeks for the scheduled member times sixty-six and two-thirds percent (66 2/3%) of the employee's average weekly wage." Id. (citing Stuart Mfg. Co. v. Walker, 313 So.2d 574, 575 (Miss.1975)). "Then, alternatively, an industrial disability must be determined that is based, not just on the medical evidence, but upon evidence of how the limited function of the member affects the employee's ability to perform those duties normally associated with the claimant's job." Hollingsworth, 725 So.2d at (¶ 10) (citations omitted).
¶ 27. "Generally, `medical' disability is the equivalent of functional disability and relates to actual physical impairment. `Industrial' disability is the functional or medical disability as it affects the claimant's ability to perform the duties of employment." Walker Mfg. Co. v. Butler, 740 So.2d 315(¶ 44) (Miss.Ct.App.1998) (quoting Robinson v. Packard Elec. Div., General Motors Corp., 523 So.2d 329, 331 (Miss.1988)).
The question in these cases is the degree of loss of use of the member for wage earning purposes, and this issue is for determination from the evidence as a whole, including medical estimates related either to the functional or industrial loss and the testimony of the claimant and other lay witnesses as to the effect of the injury upon the employee's ability to perform the duties required of him in his usual employment. In this connection, a partial loss of functional use may result in total disability, and to reach this result it is not necessary that the employee be wholly incapacitated to perform any duty incident to his usual employment or business; but if he is prevented by his injury from doing the substantial acts required of him in his usual occupation, or if his resulting condition is such that common care and prudence require that he cease work, he is totally disabled within the meaning of the statute. *387 Walker Mfg. Co., 740 So.2d at (¶ 45) (quoting VARDAMAN S. DUNN, MISSISSIPPI WORKMEN'S COMPENSATION § 86 (3d ed.1990)).
¶ 28. An injured worker is entitled to compensation based upon the higher computation of either the worker's functional or medical loss of use or industrial loss of use "but limited in all events, by the maximum compensation allowed under Section 71-3-17(c) for the injured member." Hollingsworth, 725 So.2d at (¶ 10) (citing Smith v. Jackson Constr. Co., 607 So.2d 1119, 1128 (Miss.1992)).
¶ 29. "The Commission acts as fact finder in making determinations of the level of disability." Hollingsworth, 725 So.2d at (¶ 11) (citation omitted). "[I]t is not within the realm of a reviewing court's authority to re-weigh the evidence to determine whether the preponderance of evidence might favor a result contrary to the Commission's determination." Id. So long as the record contains credible evidence which, if believed, would support the Commission's determination, we must affirm. Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1247 (Miss.1991).
¶ 30. The Commission found that Banks proved an industrial loss of use of the right arm of seventy percent and an industrial loss of the use of her left arm of thirty percent. The Commission, affirming the ALJ, presumably predicated its decision on Dr. Lucas's restrictions and limitations that he placed on Banks and her inability to perform the typical duties of her usual employment. There is substantial evidence, both medical and lay testimony, that went uncontradicted that supports the proposition that Banks's injuries had a great impact on her ability to perform the typical duties of her employment as a poultry processor. Therefore, there is no basis for this Court to disturb the Commission's findings.
¶ 31. Since we are determining that the Commission did not err in this matter, we determine that the Commission was also correct in not allowing a supplementation of the record with regard to Banks's post-injury wage earnings.
¶ 32. "The Workers' Compensation Act `arbitrarily schedules the compensation payable for loss of or loss of use of a scheduled member, focusing upon a claimant's functional loss and without regard to a loss of wage earning capacity.'" Cook, 740 So.2d at (¶ 27) (quoting Jackson Constr., 607 So.2d at 1126). "Certainly, this point can be stated no more concisely...." Cook, 740 So.2d at (¶ 27). "Because the [arm] is a scheduled member, no account is taken as to the claimant's loss of wage earning capacity." Id. at (¶ 28) (emphasis added).
¶ 33. The determination for permanent partial disability benefits for the industrial loss of the use of a scheduled member does not encompass an identification of wage earning capacity, but rather a determination of functional loss of use presented by medical evidence, and the impact that the loss of function has on the worker's ability to perform the normal and customary duties associated with the claimant's usual employment. Jackson Constr., 607 So.2d at 1128. That is presumably what the Commission did in this instance. We find no error in the Commission's determination that Tyson Foods should not be allowed to supplement the record.
¶ 34. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. STATUTORY DAMAGES AND INTEREST ARE AWARDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, P.J., IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.
SOUTHWICK, P.J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J., AND MOORE, J.
*388 SOUTHWICK, P.J., CONCURRING.
¶ 35. This is a scheduled member injury case, in which evidence supported that the occupational effect of the loss of use was greater than the medical impairment. The majority holds that the claimant's proof of that greater impact, and the employer's rebuttal of that proof, has no connection with wage-earning capacity. I believe that conclusion disregards established Supreme Court precedent. It is important that this case not itself become precedent for barring relevant evidence in the future. Nonetheless, I concur in the result for reasons that I will also explain.
¶ 36. To reiterate the relevant facts, Banks was diagnosed as having a 15% permanent medical impairment to her right arm and a 5% permanent medical impairment to her left arm. However, the Commission found that this equated to a 70% and 30% industrial disability to the right and left arms, respectively. The employer timely appealed. It later filed a motion with the Commission asking to supplement the record with a wage statement for Banks. It revealed that she began working again at McCarty shortly after the administrative judge's August 1997 hearing. The prior evidence had been that no job had been offered the claimant that was consistent with her physical limitations. The wage statement revealed 25 weeks of work, beginning the week of August 19, 1997 and continuing through January 17, 1998. This one page summary gave no indication of whether Banks had acquired a job legitimately consistent with her injury. Wage-earning capacity is not proven by receipt of wages that are for benevolent or litigation reasons. Karr v. Armstrong Tire & Rubber Co., 216 Miss. 132, 138-39, 61 So.2d 789, 792-93 (1953). The limited request to submit evidence that Banks was receiving income was not relevant on the issue of the extent of her occupational disability.
¶ 37. For that reason the Commission's refusal to supplement was proper. The Court finds the denial appropriate for a different reason: loss of wage-earning capacity allegedly is irrelevant in a scheduled member case. Sometimes that is true, but sometimes that is not true. Just as a starting proposition, there is something counter-intuitive about a claimant's receiving benefits as here that are five to six times greater than the medical impairment rating, that these increased benefits are paid because of the injury's alleged impact on her ability to work, but the employer is not allowed to show that a lesser or no occupational impact existed.
¶ 38. One of the State's leading authorities on workers' compensation principles has highlighted the line between relevance and irrelevance in this way:
There are two instances in which proof of loss of (or proof of no loss) of wageearning capacity, as a matter if law, are not relevant to a claim for benefits.... One is the loss of any two major, scheduled members, in which case permanent total benefits are payable without reference to effect on wages. The other is for loss or partial loss of a scheduled member when there is no claim for benefits in excess of the schedule or the proportion of physical impairment.

John R. Bradley, Disability Benefits in Mississippi Workers' Compensation: The Learning of 50 Years, in MISSISSIPPI COLLEGE TWELFTH ANNUAL WORKERS' COMPENSATION PRACTICE & PROCEDURE SEMINAR (1999) at 4-5 (emphasis added). Since Banks claimed and received benefits greater than her medical impairment, proof of effect on wage-earning capacity was both required and rebutable. As Professor Bradley states, "an injury's occupational effect is an element of proof when scheduled benefits" are sought due to "partial loss of use of a scheduled member when the effect on wages is greater than the proportionate impairment of the member but less than total loss of use of the member." Id. at 6 (underlining in original). Article writers may misconstrue case law just as may this judicial writer, so presently I will review the sources for Bradley's statements.
*389 ¶ 39. The possible source of the majority's contrary interpretation, with great deference for the writer of our Court's opinion, is that a section from the leading Supreme Court case has been quoted without focusing on the issue that it was then discussing. When injury to a scheduled member has occurred, a level of payment may be received that is set by a conclusive statutory estimate of the impact on a worker of that sort of injury. As the court said in the case cited by the majority, "the Act arbitrarily schedules the compensation payable for loss of or loss of use of a scheduled member, focusing upon a claimant's functional loss and without regard to loss of wage earning capacity." Smith v. Jackson Construction Co., 607 So.2d 1119, 1126 (Miss.1992).
¶ 40. When Smith referred to "functional" loss, that is the same as if it stated "medical" loss. The case cited by Smith to support the quotation above described "functional or medical impairment" as being the same thing and distinguishable from occupational disability. Walker Mfg. v. Cantrell, 577 So.2d 1243, 1247 (Miss. 1991), cited at Smith, 607 So.2d at 1126. The Smith quotation means that if a doctor's testimony or other medical evidence supports that there is a 50 per cent medical impairment to a scheduled member, benefits are awarded under the statute for a 50 per cent loss of use regardless of any impact on wage earning capacity. That is good law, but it does not apply here.
¶ 41. Smith immediately leaves the formula of benefits based on medical impairment and states this:
However, in some cases, despite a partial functional loss of a scheduled member, the claimant's industrial or occupational disability or loss of wage earning capacity controls his degree of disability.
Smith, 607 So.2d at 1126. In other words, though "wage-earning capacity" is ignored if scheduled member benefits are paid based on functional or medical impairment, when the claimant seeks more than that, wage earning impact is relevant. This distinction is I believe the source of our error.
¶ 42. Smith was written by Justice Sullivan. In another opinion the previous year by Justice Robertson, the court held that a doctor's testimony on a percentage impairment would "not have in mind occupational or industrial disability standards. Indeed, we would think it seldom that a physician would possess the expertise to give an authoritative opinion regarding loss of wage-earning capacity or occupational disability." Walker Mfg., 577 So.2d at 1248.
¶ 43. Since a doctor is not likely qualified to speak to industrial disability, just how can such disability be proven when the claimant is seeking benefits higher than what would be based just on medical impairment? One acknowledged national authority asks the question about partial loss of use of scheduled members in a more powerful way:
The trouble with these cases [that do not look at a claimant's particular trade] is that they assume that "loss of use" can be mechanically measured in relation to use by some hypothetical claimant. They assume, in other words, that the concept of "loss of use" of the hand has some fixed uniform content as to all human beings, regardless of age, sex, skill, or anything else. But the very word "use" immediately raises the question: use for what? For assembling electronic equipment? For delivering a karate chop? For threading a needle? For holding a pencil? For lifting a bale of cotton? These are all "uses," after all.
4 ARTHUR LARSON, LARSON'S WORKERS' COMPENSATION LAW 86-21 (1999) § 86.04[5].
¶ 44. Whether based on observations such as by Professor Larson or not, the Mississippi case law recognizes that the impact on that worker's wage earning capacity is relevant when the claim is for more than what functional disability alone would provide.
*390 ¶ 45. I will review, then, how this sort of claim is to be made.
¶ 46. Most of the law in this area is judge-made, that is to say, little of the nuances that affect us are quotes from specific statutory language. What is statutory is that "disability" is the "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment...." Miss.Code Ann. § 71-3-3(i) (Rev.1995). Therefore when a claimant seeks total permanent benefits, this definition of "disability" is what creates the need to prove that there is no work that can be performed at the same or other employment. The supreme court then added that the claimant must have reasonably sought other employment. Certain combinations of losses of scheduled members prove entitlement, but in "all other cases permanent total disability shall be determined in accordance with the facts." Miss.Code Ann. § 71-3-17(a) (Rev.1995).
¶ 47. Permanent partial disability is a category that includes a statutory schedule of severed bodily members. Miss.Code Ann. § 71-3-17(c) (Rev.1995). The total dismemberment of an arm, for example, receives the highest level of compensation of any scheduled member injury, an amount that is also paid even if the arm is not severed, but there is a total loss of use of the arm. Miss.Code Ann. § 71-3-17(c)(1) & (22). In addition to these scheduled members, permanent partial disability can be proved by a partial and permanent loss of capacity to earn wages "in the same employment or otherwise...." Miss.Code Ann. § 71-3-17(c)(25).
¶ 48. The category of injury that concerns us is the partial loss of use of a scheduled member. The statutory reference to that provides that "permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of the member." Miss.Code Ann. § 71-3-17(c)(23). A doctor may give evidence that the claimant's medical impairment to his leg is twenty per cent, but other evidence indicates that this leg injury had a fifty percent effect on the claimant's ability to engage in his occupation. Such evidence can be relied upon to increase the scheduled member benefits. Walker Mfg., 577 So.2d at 1248. The dichotomy that has been created between medical impairment and industrial disability emanates from the statutory scheme but is not specifically mentioned in the statute. Much of workers' compensation case law is more in the nature of detecting penumbras than applying tangible statutory language. Taking the many variations that can arise with disability claims, the Supreme Court has had to create rules. It has made the most reasoned judgment possible in applying the found facts to the statute that imperfectly covers the situation.
¶ 49. The statute creates presumptions of the effect of scheduled member injuries, e.g., the loss of an arm entitles the claimant to 200 weeks of benefits. Miss.Code Ann. § 71-3-17(c)(1) (Rev.1995). That the arm is unusable can be supported by medical testimony. If the arm has been severed, that proves itself. Similarly, if a proportionate loss of use is relied upon, medical testimony can show, for example, that there is a twenty per cent medical impairment. That medical impairment if accepted by the fact-finder is the absolute minimum entitlement for the claimant. If the claimant wishes more, then an industrial disability greater than functional disability must be shown.
¶ 50. The greater industrial disability according to Walker and Smith v. Jackson Construction is shown by the injury's effect on wage-earning capacity. One example of such proof applies to a worker who has been paid on a piece-work basis. If a twenty per cent medical impairment to the arm has slowed the claimant such that only half as much piece work is completed, that translates into a fifty per cent occupational effect. John R. Bradley, Measuring Benefits for A Scheduled Member, in MISSISSIPPI COLLEGE EIGHTH ANNUAL WORKERS' COMPENSATION PRACTICE & PROCEDURE SEMINAR *391 (1995) at 29. Instead of the 200 weeks compensation for the loss of use of an arm being reduced by the medical impairment to 40 weeks (20% × 200 weeks), benefits would be paid because of the industrial disability for 100 weeks (50% × 200 weeks). The example requires evidence of impact on wages at least in the same occupation. How to determine occupational effect on hourly wages may not be so clearcut.
¶ 51. I return to the important language in the case relied upon by the majority: "in some cases, despite a partial functional loss of a scheduled member, the claimant's industrial or occupational disability or loss of wage earning capacity controls his degree of disability." Smith v. Jackson Construction, 607 So.2d at 1125-26 (italics added). A line of cases was then discussed in which proof of an industrial disability greater than the functional one was accepted and allowed for higher benefits. Id. at 1126. The new law made by the Smith v. Jackson Construction decision was that if "a claimant is unable to earn wages despite only a loss or loss of use of a scheduled member, then the claimant is permanently and totally disabled." Id. at 1128. Under that situation, the scheduled member section of the statute does not even apply. Id.In contrasting that rule, the court also said that if the claimant's "occupational loss or loss of wage earning capacity was greater than [the medical impairment] then Section 71-3-17(c) makes clear the Commission should have awarded Smith that percentage of his industrial occupational disability, limited by the number of weeks he is entitled to receive compensation for the loss of use of a scheduled member." Id. (emphasis added).
¶ 52. What else besides effect on the ability to earn wages could be meant when the Commission is permitted to find that the occupational effect caused by a scheduled member injury is greater than the medical impairment? I cannot discern any third factual category relevant for workers' compensation, something that is neither the medical limitation on a scheduled member but also is not connected with the ability to work. As Professor Larson indicates, some states' courts apparently have concluded that there is a generic set of work requirements for which loss of use can be measured against. Regardless, Walker Manufacturing and even more clearly Smith v. Jackson Construction are talking about wage earning capacity when scheduled member benefits greater than medical impairment alone are being sought. Therefore, when a claimant wishes to leave his medical testimony behind and enter the world of occupational impact, Smith v. Jackson Construction holds that "occupational loss or loss of wage earning capacity" is the issue.
¶ 53. Yet this does not completely answer our question. Though I do not find that there is a generic list of job duties against which to measure the impact of an scheduled member injury, I also do not find that the ability of the claimant to work at any possible and available job is the proper inquiry. If a partial loss of use of a scheduled member results in an inability "to perform the substantial acts of the worker's usual occupation," the worker is entitled to the same compensation as for total loss of use of the member. Richey v. City of Tupelo, 361 So.2d 995 (Miss.1978).
¶ 54. The principle of substantial acts of usual employment was first applied in an appeal when the compensation statute was only three years old. The case imported a general disability insurance standard. M.T. Reed Const. Co. v. Martin, 215 Miss. 472, 477-78, 61 So.2d 300, 303 (1952), citing Lipnick v. New York Life Ins. Co., 211 Miss. 833, 838, 52 So.2d 916, 917 (1951) and Metropolitan Cas. Ins. Co. v. Cato, 113 Miss. 283, 74 So. 114 (1917). Cato is a good example of the law that the Court applied by analogy in M.T. Reed to the then-new workers' compensation statute. The insurance policy provided that if injuries "continuously and wholly disable and prevent the insured from performing any and every kind of duty pertaining to his *392 occupation," benefits for total disability will be awarded. Cato, 74 So. at 116. The Court then interpreted that phrase:
"Total disability must, from the necessity of the case, be a relative matter, and must depend largely upon the occupation and employment in which the party insured is engaged.
"One who labors with his hands might be so disabled by a severe injury to one hand as not to be able to labor at all at his usual occupation, where as a merchant or a professional man might by the same injury be only disabled from transacting some kinds of business pertaining to his occupation."
Cato, 113 Miss. 283, 74 So. 114, 117 (quoting Wolcott v. United Life & Accident Ins. Ass'n, 8 N.Y.S. 263, 264 (1889). Though the example just quoted dealt with a hand injury, the case law and the insurance policies were not limited to such injuries. Cato involved a general accidental injury policy. Cato, 74 So. at 115. Another case quoted for the principle that disability arises from an inability to perform "the substantial acts required of him in his business," was interpreting a policy covering bodily injury and disease. Lipnick, 52 So.2d at 917, quoted in M.T. Reed, 61 So.2d at 303.
¶ 55. Though the original quotations themselves and the insurance precedents from which they were taken were not limited to scheduled member injuries, they did define "occupation" narrowly, i.e., the specific usual employment of the insured. These cases usually did not stop their analysis with the effect on the usual employment, but also made statements such as it also "appears most unlikely that he will be able to pursue any other gainful employment...." M.T. Reed, 61 So.2d at 303; Lipnick, 52 So.2d at 917 ("his physical condition is such that ... common care and prudence require that he cease all work...."). See also McGowan v. Orleans Furniture, Inc., 586 So.2d 163, 168 (Miss.1991) (claimant's physical limitations and education will make finding any other job difficult); Piggly Wiggly v. Houston, 464 So.2d 510, 513 (Miss.1985) (unlikely that claimant will be able to pursue other employment); McManus v. Southern United Ice Co., 243 Miss. 576, 582-84, 138 So.2d 899 (1962) (not worked since injury, 63 years old and 4th grade education); Tyler v. Oden Construction Co., 241 Miss. 270, 273, 130 So.2d 552 (1961) (due to advanced age and physical condition, unlikely claimant will be able to pursue other employment). These recurring observations about absolute employment disability are curious, but probably not controlling.
¶ 56. Even so, "substantial acts of usual occupation" suggests a narrowly defined "occupation." Disability is measured by comparing the requirements of the former occupation to the current capabilities of the claimant. The Supreme Court has over time increasingly stressed the occupational impact and minimized reference to the overall impact on employability, only finally to eliminate the latter as a matter even of comment by the time of Smith v. Jackson Construction (total unemployability removes the claimant from the scheduled member scheme altogether). Scheduled member caselaw is an archetypical example of the kind of rules that are not mandated by statutory language but are a Supreme Court effort to make the statute operate effectively. The concept of predetermining benefits through a schedule promotes a streamlining of the claim process. Perhaps the Court believed when the loss of use was only partial, that limiting the issue to whether the claimant still could perform his previous job was part of the streamlining.
¶ 57. Since this part of compensation law is not driven by distinct statutory provisions, what is to be shown to prove or rebut a case regarding the substantial acts of usual employment also can not be found in the statute. For example, the range of the duties of an "occupation" is difficult to map. Is Banks's occupation limited to the duties that she normally would have done for McCarty Farms at its chicken plant, or *393 would other duties there for which she was qualified be included?
¶ 58. There is no need to answer these questions now. My principal point is that whatever the range of relevant occupations might be for proving a total loss of occupational use of a scheduled member, the claimant should be subject to the same employment range when a partial occupational loss greater than medical impairment is being sought.
¶ 59. To gain some perspective on when impact on wage earning capacity is relevant in the varied factual and legal scenarios with scheduled member cases, I will describe several related ones:
1) If the claimant seeks compensation for total loss or loss of use of a scheduled member, effect on wages does not matter. McKenzie v. Gulf Hills Hotel, Inc., 221 Miss. 723, 74 So.2d 830 (1954) (physical loss of eye when the claimant was already blind in that eye is fully compensable).
2) If the claimant seeks damages based on partial loss of use of a scheduled member, without proving that the industrial effect is greater than the medical impairment, there is no need to show impact on wage-earning. The statutory schedule conclusively predetermines a minimum effect. Walker Mfg., 577 So.2d at 1248. The employer would not be entitled to show less effect on wage-earning than the statutory schedule. Id.
3) The claim may be that a loss of use of a scheduled member has resulted in a permanent total disability to the body as a whole. In such a case, the claimant is entitled to have the scheduled member benefit scheme ignored and to have total permanent disability benefits awarded. Smith v. Jackson Construction, 607 So.2d at 1126. Such a claim requires the same evidentiary presentations as for non-scheduled member cases when total permanent disability is sought. This means proof that due to a work-related injury to a scheduled member there has been a total loss of wage-earning capacity in the same or other employment, and that employment had unsuccessfully been sought. Id. at 1128. A statutory version arises from the loss of two major scheduled members. That automatically leads to permanent total benefits. Miss.Code Ann. § 71-3-17(a).
4) If the claimant argues that a partial medical impairment to a scheduled member has an occupational effect that is the same as a total loss of use, there must be proof that the claimant cannot engage in the substantial acts of his usual occupation. McGowan, 586 So.2d at 168. Though much of the case law also addressed the injury's impact on overall wage-earning capacity, that latter issue is not part of the formula for awarding benefits.
5) Our issue is yet another category. A claimant may seek benefits for an occupational loss of use of a scheduled member that is greater than the medical impairment but still less than total loss of use. The claimant is entitled to have benefits measured by the greater of the medical impairment or the occupational disability. Walker Mfg. v. Cantrell, 577 So.2d at 1248. As suggested in Walker, later repeated in Smith v. Jackson Construction, and as appears to be a more sensible rule to Professor Larson, this measures the impact of the injury on the wage earning capacity of that employee to perform substantial acts of the occupation that the person held when injured. What exactly that means has already been reviewed, though not answered.
¶ 60. A case that highlights better than any other the evidence that is admissible is Walker v. Cantrell, 577 So.2d at 1248. Cantrell was diagnosed with a five per cent medical impairment to his hand. The claimant, though, testified that this hand injury had made him unable to "perform the substantial acts of his employment...." Id. at 1245 & 1248. The Supreme Court upheld the Commission's limiting him to a five per cent partial loss of use of his hand for these reasons:
*394 a) Cantrell offered no evidence that he attempted "to perform his usual duties.... There is nothing in the record suggesting that following his recuperation from his last surgery Cantrell attempted, with Walker Manufacturing or any other employer, to perform duties like ... those he was performing prior to his injury back on September 9, 1985." Id. at 1248.
b) Second, there was no witness who corroborated that he could not perform "the usual duties of his customary employment." Id. Cantrell's testimony was the sole support of his claim.
c) Finally, the Commission stated that there was no evidence that he had been "refused employment based upon the disability to his hand." Id. "A claimant such as Cantrell must make a reasonable effort to secure other comparably gainful employment. The law does not require that he move to another part of the state, but he must cast his eyes further than across the street ... The Commission was within its prerogatives when it interpreted Cantrell's proof as failing to establish that he was refused comparably gainful employment because of the disability to his hand." Id. at 1249.
¶ 61. This last item is unusual for a scheduled member injury case. A requirement of looking for other work does not usually appear in such case law. Another precedent permitted recovery for total loss of occupational use of the claimant's leg even though he had not looked for another job. McGowan, 586 So.2d at 168. McGowan was severely limited by his leg injury and no longer could perform a large number of the requirements of his former job. The Court also said that there were few jobs of any sort that he could likely find, so a search could have been seen as futile. Id.
¶ 62. Though McGowan and Walker Mfg. could be viewed as inconsistent on the need to show a failed effort to search for other work, they can be made to fit together coherently if the statement in Walker Mfg. that such a claimant must seek other work is moderated. What in essence both mean is that when a claimant seeks benefits based on a enhanced occupational effect of an injury to a scheduled member, a variety of evidence is relevant to whether in fact the claimant is unable to perform the substantial acts of the employment. Relevant evidence is that which has "any tendency to make the existence of any fact ... more probable or less probable...." M.R.E. 401. Cantrell refused to return to work at his former employer and made no attempts to find work elsewhere. Seeking and failing to get a job because of a disability is relevant evidence for the claimant; not seeking at all, especially when there is reasonable doubt about the seriousness of the occupational effect of an injury, can be relevant but not conclusive for the employer. Seeking another job did not have to be shown in McGowan and benefits were awarded; failing to do anything was shown in Walker Mfg. and was relevant in refusing to find the claimant credible.
¶ 63. Whatever the entire range of relevant evidence, this review makes clear that McCarty Farm's offering only the wage statement was inadequate to require reopening the case. Such evidence might have been part of a larger relevant presentation but was insufficient by itself.
¶ 64. I find areas of uncertainty, but none with the issue that has caused me to opine at such length. Evidence of effect of wage earning capacity is relevant when a claimant seeks more than just the benefits based on functional impairment to a scheduled member. I agree with affirming in this case since an inadequate offer of evidence was made when the employer sought to supplement the record.
¶ 65. We should be clear that this category of evidence may be admissible in other cases.
McMILLIN, C.J., AND MOORE J., JOIN THIS SEPARATE OPINION.